Filed 12/16/14  P. v. Cheam CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B251610 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. NA093626) |
| CHANTHA CHEAM, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Arthur Jean, Jr., Judge.  Affirmed.

Lenore De Vita, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

In a jury trial, Chantha Cheam (appellant) was convicted in count 1 of attempted voluntary manslaughter (Pen. Code, §§ 664, 192, subd. (a)),[1] with true findings of the personal use of a deadly and dangerous weapon, a knife, and of the personal infliction of great bodily injury (§§ 12022, subd. (b)(1), 12022.7, subd. (a)), and in count 2 of felony child abuse (§ 273a), with a true finding of the personal use of a deadly and dangerous weapon, a knife (§ 12022, subd. (b)(1)).

At sentencing, the trial court imposed a total term in state prison of seven years, consisting of a three-year middle term for the offense of attempted voluntary manslaughter, enhanced by three years for the personal infliction of great bodily injury and by a consecutive one-year term for the use of the knife, plus a concurrent four-year middle term for the felony child abuse.

## CONTENTIONS

1. The trial court prejudicially erred by charging the jury with an instruction on felony child abuse that was flawed and incomplete. In the alternative, trial counsel was constitutionally ineffective as he failed to request definitions of, and/or the amplification of, the terms "criminal negligence" and "great bodily harm."

2. Appellant was entitled to a sua sponte lesser included jury instruction on misdemeanor child endangerment. In the alternative, appellant contends trial counsel's failure to request such an instruction constitutes the ineffective assistance of counsel.

3. The evidence is insufficient to support appellant's conviction of attempted voluntary manslaughter.

4. The evidence is insufficient to support appellant's conviction of felony child abuse.

5. Appellant requests this court to conduct an independent review of the in camera *Pitchess* hearing. (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).)

None of the contentions requires a reversal, and we will affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## BACKGROUND

We view the trial evidence in the light most favorable to the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

At approximately 5:30 p.m. on October 9, 2012, Long Beach Police Officer Daniel Mendoza received a call to respond to 1030 Grand Avenue concerning a battery. On the ground level, next to an apartment complex, the officer found a wounded woman and a female teenager with an injury to her leg. A number of persons were standing with them outside the complex. No one spoke English. Sunra Sorn (Sorn), the occupant of apartment No. 8, pointed upstairs to her apartment. About twenty minutes later, appellant surrendered himself to the police and came downstairs from apartment No. 8.

The officers recovered two knives from the unit: one covered with dried blood in a kitchen drawer and another folding utility knife, which was located behind the couch in the living room. Sorn pointed out the knives for the officers.

After the uniformed officers responded, Long Beach Police Officer Udom Sawai (Officer Sawai), a detective who spoke Khmer, also responded.[2] Initially, he spoke to the victims who were sitting outside apartment No. 8 with the other onlookers. Officer Sawai discovered the assailant was refusing to emerge from the apartment. Officer Sawai obtained the telephone number for the apartment and spoke to appellant, the assailant, by telephone. After six or seven requests over ten minutes, appellant complied with the officer's requests to surrender. Appellant walked downstairs unarmed and was taken into custody.

After the arrest, appellant showed officer Hector Gutierrez (Officer Gutierrez) a small stab wound he had in his abdomen.

M.S (S.), the victim, testified at the trial on October 9, 2012, she and her teenage daughters, C. and Ch., met her former husband, appellant, at Sorn's apartment. S. wanted to obtain her daughters' birth certificates from appellant.

---

[2] Khmer, or Cambodian, is the language of the Khmer people, an aboriginal people of Cambodia, and the official language of Cambodia.

3

S. said she and appellant were sitting on the furniture in Sorn's living room to talk. Soy and appellant were divorced. S. wanted their daughters, who had been living in California with appellant, to come to live with her. S. and appellant were discussing the teenagers' birth certificates in the presence of Sorn and her daughters, who were sitting in close proximity to S.[3] In the discussion, appellant changed the subject and asked S. to come back to live with him. S. replied, "No." Appellant became insistent. Suddenly, appellant leapt up from his position on the sofa and approached S. and "wrestled" with her. S.'s knees buckled, and she fell onto her knees on the floor. She felt numb in the abdomen and hand. Her daughters shouted and pulled at appellant, attempting to separate them. Sorn also attempted to pull appellant away from S.

To get away from appellant, S. ran out of the apartment and downstairs. As she opened the front door, she saw blood on her hand. A crowd gathered, and three minutes later, her daughters emerged from the apartment and joined her downstairs. Her younger daughter, C., was wounded in the knee. S. was having difficulty breathing, and the ambulance arrived.

At the hospital, S. discovered she had been stabbed in the abdomen and arm by appellant. The wounds required surgery, and she spent three days in the hospital. During the attack, she never saw the knife.

During cross-examination, S. explained she had immigrated from Cambodia and had divorced appellant in Cambodia. She came to the United States and married a man who lived in Kentucky. She had since divorced that man. Appellant had also immigrated and was raising their two daughters in Los Angeles. S. was sorting out her immigration status at the time she visited Los Angeles. She wanted her two daughters to be living

---

[3]    In her opening statement, the prosecutor explained the photographs taken of Sorn's living room would show a large sofa, a smaller one and an ottoman. She claimed the testimony would show Sorn and appellant were sitting on the smaller sofa, C. and Ch. were sitting on the larger sofa and S. sat on ottoman. In S.'s testimony, the prosecutor had S point out in the photograph where everyone was sitting. Sorn testified the teenagers were seated on the couch about four feet from location of the attack.

with her partially for reasons of improving her chances of immigrating. However, she also wanted her daughters to live with her.

At the time of the stabbing, S. and appellant were arguing about whether both daughters would go with S. to Kentucky or whether, as appellant wished, they should split up the daughters. Appellant also asked S. to resume family life with him. S. told appellant she did not want to live with him anymore, and she had another relationship.

C., age 12, testified that prior to the stabbing, she was sitting on the sofa between her parents. Her parents were talking normally, and she was talking to her sister and playing with a mobile phone. Suddenly, appellant rushed in as if to give S. a kiss. S. told appellant, "Stay away." C. grabbed appellant to prevent him from moving forward. When C. did so, she felt a numbness in her leg. Later, C. looked down, and her knee was bleeding. All C. saw concerning the stabbing was wrestling after appellant had hugged S. C. never saw a knife.

C. identified the photograph of the stab wound to her knee. She explained she was in the hospital overnight, but was released in the early morning hours of the following day. The doctor sutured her wound. The stabbing left a scar on her knee.

Ch., age 14, testified that after S. stated she would refuse to live with appellant, appellant rushed at S. Ch. had believed appellant was going to hug or to kiss S. When appellant hugged S., Sorn and C. grabbed appellant and pulled him away from S. After the wrestling, Ch. saw blood, and S. ran out the front door. There was blood on S.'s back.

Ch. got a towel from the bathroom and wrapped it around her sister's wounded knee. Ch. said she felt sorry for appellant as Ch. was going to Kentucky to live with S. She also felt bad as S. had been hurt. Ch. did not bring a knife to the meeting. When she saw appellant after the stabbing, she saw no blood on his clothing.

Ch. testified she did not recall telling a police officer that after the stabbing, she had returned upstairs to get her purse. When Sorn entered the apartment, appellant -- was sitting there crying. She did not recall telling the officer she had observed her father

5

stabbing himself. She denied telling the officer at the hospital that during the melee, she had seen appellant swinging a knife.

Sorn testified she was a friend of appellant. She had agreed to permit appellant to meet with his former wife and children at her apartment. At the meeting, appellant was behaving normally, and appellant told her he loved his former wife and children. During the conversation, appellant asked S. to stay with him "for the time." He pled with S. to do so, but S. replied, "No." Sorn had been concerned there would be an altercation. So when appellant moved in S.'s direction, Sorn grabbed him.

Sorn saw appellant shout at S. and grab S. by the hair. Sorn tried to separate them. Sorn told S. to leave. Sorn did not see the knife, but saw the blood on the door when Sorn walked downstairs. Sorn was present after the stabbing when appellant stabbed himself. At that time, appellant instructed Sorn to go downstairs and to take care of S. Before Sorn did so, Sorn took the knife from him as she was concerned he would stab himself again. When she went downstairs, the police had already arrived. She put the knife away.

Sorn explained she had observed two knives before she went downstairs, one in appellant's stomach, a wood knife, and another on the carpet where S. had been sitting on the sofa. Appellant had told her he wanted the knife to kill himself. Sorn picked up the knife on the carpet and tossed it behind the sofa to prevent appellant from using it to stab himself. One of the knives belonged to her. But the other one was not hers. Then she contradicted herself and said, "I don't know what knives I have at home."

During cross-examination, Sorn admitted that prior to the stabbing, appellant had gotten down on his knees and was pleading with S. to stay with him. He was crying. When S. refused, appellant stood up. That was when Sorn grabbed his legs. She pulled appellant and S. away from one another so there would be no contact and S. could leave the apartment.

Officer Jayson Torres (Officer Torres) testified he spoke to Ch. at the hospital. Ch. replied to him in broken English, but the officer had no difficulty understanding her. Ch. told the officer she saw her father swing a knife at S. and stab S. When Ch. went

6

upstairs to get her purse, her father had a knife in hand and was using it on himself. He was upset because their mother wanted to take the girls with her to live in Kentucky. Ch. said in the melee, she also saw appellant swing his knife at C.

Dr. Mauricio Heilbron (Dr. Heilbron) testified he was a surgeon who worked at various hospitals in Long Beach. When S. arrived at the hospital, it was determined S. had a "level one trauma" wound and multiple stab wounds. He examined S. She had an extremely deep laceration to the abdomen which was so deep, it required exploratory surgery. Initially, he inserted a camera to determine the depth of the wound; he said the wound went all the way through the abdomen. So he performed surgery.

Dr. Heilbron described there was a large amount of bleeding. The knife had cut the rib and the subcostal artery, which can bleed torrentially. Dr. Heilbron had to stop the internal bleeding. Then he had to go outside and open the wound to stop further bleeding from the muscle. He then explored inside S.'s abdomen to ensure the internal bleeding had stopped. S. had less serious cuts on her arm and hands. Dr. Heilbron used sutures and stitches to repair the surgery wound and the knife wounds. Without surgery, S. would have bled to death.

In defense, appellant produced no evidence and declined to testify on his own behalf.

## DISCUSSION

1. *The contention the trial court delivered an incomplete and flawed jury instruction on felony child abuse.*

Appellant contends the jury instruction on felony child abuse was flawed and incomplete and the errors are of federal dimension and structural error, requiring a *per se* reversal.

7

a. *Background*.

(i) *The jury instructions*.

The trial court charged the jury as to attempted deliberate and premeditated murder, attempted murder without deliberation and premeditation, and attempted voluntary manslaughter, the personal infliction of great bodily injury, felony child abuse and the use of the deadly or dangerous weapon, the knife.

With respect to felony child abuse, the trial court charged the jury with a modified version of CALJIC No. 9.37. It charged the jury initially in the general language of the statute. But in its specifics, at the end of the instruction, the charge was limited to that part of section 273a, subdivision (a), prohibiting a person having the care or custody of a child, under circumstances or conditions likely to produce great bodily harm or death, from willfully causing or permitting the person or health of the child to be injured, or willfully causing or permitting that child to be placed in a situation where his or her person or health is endangered.

The trial court also delivered to the jury a set of written instructions for its use during deliberations.[4]

---

[4] Section 273a, subdivision (a), is an omnibus statute that proscribes essentially four branches of conduct. It provides: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years."

The trial court charged the jury orally with a modified version of CALJIC No. 9.37, as follows.

"Mr. Cheam is accused in count 2 of having violated § 273a, subdivision (a), of the Penal Code of our state, involving the alleged victim C., the younger of the two of the girls who testified.

"Every person who, under circumstances or conditions likely to produce great bodily harm or death, willfully inflicts unjustifiable physical pain or mental suffering on a child, or willfully causes or, willfully and as a result of criminal negligence, permits a child to suffer unjustifiable physical pain or mental suffering, or has care or custody of a

8

(ii) *The prosecutor's comments to the jury with respect to felony child abuse*.

In commenting during final argument on felony child abuse, the prosecutor explained to the jury the prosecution was not asserting appellant had the specific intent to

---

child and . . . willfully causes or, willfully and as a result of criminal negligence, permits a child to be placed in a situation where his or her person or health may be endangered, is guilty of a violation of this code section.  [(Cont. on page 9)]
"The word 'likely' as used in this crime means that the circumstances or conditions are such that they present a substantial danger, that is, a serious and well-founded risk of great bodily harm or death.
"The word 'willfully' as used in this instruction, means with a purpose or willingness to commit the act.
"The word 'willfully' does not require any intent to violate the law or to injure another or to acquire any advantage.
"In the crime charged, there must [exist] a union or joint operation of act or conduct and general criminal intent.
"To establish general criminal intent it [is not] necessary that there should exist an intent to violate the law.  A person who intentionally does that which the law declares to be a crime, is acting with general criminal intent even though he may not know that his act or conduct is unlawful.
"Unjustifiable physical pain or mental suffering is pain or suffering which is not reasonably necessary or is excessive under the circumstances.
" 'Great bodily harm' refers to significant or substantial injury and does not refer to trivial or insignificant injury.
"If a child is placed in a situation likely to produce great bodily harm or death, it is not necessary that actual bodily injury occur in order to constitute the offense.
"However, if great bodily injury does occur, its nature and extent are to be considered in connection with all the evidence in determining whether the circumstances were likely to produce great bodily harm or death.
"In order to prove this crime, each of the following elements must be proved:  [¶]
"1.  That a person who had care or custody of a [child] willfully caused or, willfully and as a result of criminal negligence, permitted the child to be injured; or willfully caused or, willfully and as a result of criminal negligence, permitted the child to be placed in a situation where his or her person or health may be endangered; and
"2.  The person's conduct occurred under circumstances likely to produce great bodily harm or death."
The No. 2 element set out immediately above was crossed out in the written set of instructions delivered to the jury.  However, the trial court had placed a notation, "IN," on the written instructions in the left margin next to the paragraph specifically describing the No. 2 element of the offense.

9

kill C., the intent with which he had attacked her mother, S. The prosecution's theory of felony child abuse was appellant had "created a dangerous and hazardous environment by welding [*sic*] a knife toward his ex-wife, in front and around his daughters. And in the process, his daughter, [C.], was cut." The prosecutor argued: "So, element No. 1, a person willfully caused or willfully and as a result of criminal negligence, permitted a child to suffer unjustifiable physical pain and mental suffering."

The prosecutor then described how the evidence showed C. had to have sutures to her knee at the hospital, which amounted to the infliction of "undue physical pain." The prosecutor argued: "And as a result of criminal negligence, welding [*sic*] and swaying [*sic*] a knife in the air around your ex-wife in close proximity to your children, four feet . . . .welding [*sic*] a knife with your children in the way. That's the child abuse in this case. [¶] Two, the person's conduct occurred under circumstances likely to produce great bodily injury."

b. *The relevant legal principles*.

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. [Citation.] . . . 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citation.]" (*People v. Sedeno* (1974) 10 Cal.3d 703, 715 (*Sedeno*).)

"In reviewing a claim of instructional error, the ultimate question is whether 'there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.' [Citation.] '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an

10

instruction or from a particular instruction.' [Citation.] 'Moreover, any theoretical possibility of confusion [may be] diminished by the parties' closing arguments . . . .' [Citation.] ' " 'Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case.' " ' [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220 (*Hajek*).)

    c. *The elements of the offense of child abuse*.

In *People v. Valdez* (2002) 27 Cal.4th 778, 782-783 (*Valdez*), the court discussed the elements of the offense of felony child abuse. Concerning the direct infliction of unjustifiable pain or mental suffering on a child, "essentially a battery," it said the mens rea was "the intent to perform the underlying injurious act on a child." (*Id.* at p. 786, citing *People v. Sargent* (1999) 19 Cal.4th 1206.) It is a general intent crime. (*Valdez,* at p. 787.)

However, for indirect abuse, the other prongs of the statute, the court in *Valdez* determined the proper mens rea is criminal negligence. The court explained. ". . . [U]se of a general intent standard is appropriate when the statute criminalizes commission of a battery, or direct infliction of unjustifiable pain or suffering. By contrast, criminal negligence is the appropriate standard when the act is intrinsically lawful, such as leaving an infant with a babysitter, but warrants criminal liability because the surrounding circumstances present a high risk of serious injury. Criminal negligence is not a 'lesser state of mind'; it is a standard for determining when an act may be punished under the penal law because it is such a departure from what would be the conduct of an ordinarily prudent or careful person under the same circumstances. When that departure endangers the person or health of a child and is 'under circumstances or conditions likely to produce great bodily harm or death,' it constitutes a felony violation of the child endangerment statute. (§ 273a, subd. (a).)" (*Valdez, supra*, 27 Cal.4th at pp. 789-790.)

The court defined the term "criminal negligence" as follows: "Criminal negligence is ' "aggravated, culpable, gross, or reckless . . . conduct . . . [that is] such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life

11

. . . ." ' [Citation.] 'Under the criminal negligence standard, knowledge of the risk is determined by an objective test: "[I]f a reasonable person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness." ' [Citations.] Under section 20, criminal negligence 'may be sufficient to make an act a criminal offense, without a criminal intent.' [Citation.]" (*Valdez, supra*, 27 Cal.4th at p. 783.)

Criminal negligence is not accidental conduct. It is a gross departure from the conduct of an ordinarily prudent person. (*Valdez, supra*, 27 Cal.4th at p. 790.)

d. *The analysis*.

As nearly as we can ascertain, appellant makes a general claim the jury instruction was flawed, confusing and failed to define key legal terms. He argues: "As given, it was impossible for the jury to have complied with the instruction and have concluded appellant was guilty of felony child abuse." He asserts the statute is complex as it contains several ways in which a person might violate its prohibitions, and "[i]n order for it to be 'instructive,' it must properly be tailored to [the] circumstances of the case. This the trial court failed to do [so]." He also concedes the trial court's instruction charged the jury as to both direct and indirect child abuse and then claims surplusage in the instruction likely confused or inflamed the jury.[5] He complains the trial court reneged on an agreement to charge the jury only as to the child endangering and omitted a definition of "bodily harm."

He then makes the following specific complaints of error: (1) The court erred by omitting an instruction felony child abuse is required to be committed under circumstances and conditions likely to produce great bodily harm or death; (2) the jury instruction failed to contain a complete definition of the term, "bodily harm," and, as

---

[5] In discussing his surplusage claim, appellant conceded the following in briefing: "The trial court instructed the jury with every option, direct and indirect, and with both mental states when it should have instructed the jury consistent with the People's theory of the case. As such, the jury was allowed to chose from a multitude of inapplicable options and mental states to find appellant guilty."

12

given, impermissibly allowed the jury to find great bodily harm was done even if it had concluded . . . the injury was moderate"; and (3) the jury instruction improperly failed to define the technical term, "criminal negligence."

He argues the failings above constituted prejudicial per se error as the "deficient and confusing instruction relieved the prosecution of the burden of proving beyond a reasonable doubt each element of the" offense, thereby depriving him of due process under the state and federal constitutions, as well as his constitutional right to a jury trial.

We discuss these claims below.

(i) *The general complaints of error.*

Appellant's general complaint the jury instruction given was hopelessly confusing does not rise to a showing of error, much less reversible error. Cases are frequently tried on multiple theories of liability. Absent a showing of error, we presume jurors comprehend and accept the trial court's directions. The crucial assumption underlying our constitutional system of error of trial by jury is that jurors generally understand and faithfully follow instructions. (*Hajek, supra,* 58 Cal.4th at p. 1216.)

Appellant generally complains of surplusage and that the instructions were not tailored to the prosecution's theory of the case. However, " 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.]" (*Sedeno*, *supra*, 10 Cal.3d at p. 715.) The trial court's duty to instruct is grounded in its evaluation of the charges and the *trial evidence* in the case, not in the theories the prosecutor selects as those most likely to secure a conviction.

Furthermore, " '[t]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language.' " (*People v. Estrada* (1995) 11 Cal.4th 568, 574 (*Estrada*).)

Here, appellant concedes the jury instructions were complete, except as he specifies. We conclude, in this particular case, the trial court's charge evaluated as a

13

whole, set out all the applicable elements of the offense on theories of the direct infliction of injury and child endangering. It also informed the jury the direct infliction of injury required willfulness, which was defined, and that child endangering required a willful act permitting or placing the child in circumstances that risk injury or death with criminal negligence.

"Giving an instruction that is correct as to the law but irrelevant or inapplicable is error. (*People v. Rowland* [(1992) 4 Cal.4th 238,] 282.) Nevertheless, giving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal." ' (*Ibid.*)" (*People v. Cross* (2008) 45 Cal.4th 58, 67.) Given appellant's outrageous conduct, appellant cannot complain instructing on alternate but inapplicable theories of the case was so inflammatory as to prejudice him. Moreover, the jury was charged that "[w]hether some of the instructions apply will depend upon what you find the facts to be. Disregard any instruction which applies to facts determined by you not to exist."

Insofar as appellant complains the trial court reneged on an agreement to charge the jury only as to child endangering, the claim in part rests on a misrepresentation of the import of the trial court's comments in discussing the jury instructions. The trial court agreed only to charge the jury as to the last two subparts of the pattern instruction CALJIC No. 9.37. As phrased in that pattern instruction, the language encompasses the direct infliction of injury, as well as indirect child abuse. There appears to be no error in such a charge as appellant's conduct properly could be prosecuted as either direct or indirect child abuse. The prosecutor made no explicit election here, and none was required. The prosecutor's comments during final argument appear to conflate theories of direct and indirect conduct. The trial court's comments in discussing jury instructions suggest it agreed only to give the latter two charges as set forth in the pattern instruction, which is exactly what the trial court did. If trial counsel believed the trial court had reneged on its representations as to the charge given to the jury, trial counsel would have objected to the instruction and requested the trial court reinstruct the jury as agreed. Trial

14

counsel in this instance made no objection to the jury instructions after the trial court had completed its charge.[6]

We conclude the trial court did not err by failing to tailor the instruction to the elements at issue, and any surplusage in the trial court's instructions was nonprejudicial.

(ii) *The specific complaints of error*.

(a) *The complaint the written instruction was incomplete*.

In the modified CALJIC No. 9.37, the trial court charged the jury in pertinent part the prohibited child abuse must occur "under circumstances or conditions likely to produce great bodily harm or death." Appellant argues the omission of this element of the offense in the trial court's written instructions likely confused the jury and prejudiced him, thereby denying him due process and his right to a jury trial. We disagree.

Appellant never objected to the jury instructions on this ground. Consequently, there is a forfeiture. However, we will address this claim on the merits to forestall his claim of ineffective trial counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 697; *People v. Kipp* (1998) 18 Cal.4th 349, 366-367 ["If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient."].)

On the merits, in the second and third paragraphs of the instruction, the trial court charged the jury in the statutory language of the offense and informed the jury a conviction required a finding the child abuse must occur "under circumstances or conditions likely to produce great bodily harm or death." The trial court also charged the jury as to this element twice during its oral charge, particularly citing the element in the latter part of its instructions where it was specific concerning the elements of child abuse. In its written instructions, this latter advice was crossed off. However, next to the

---

[6] We note the newer pattern instruction for felony child abuse in CALCRIM No. 821 employs a different interpretation of the terms of section 273a. As those pattern instructions apply here, we find no error in either interpretation of the statute. We were unable to find any case authority holding CALJIC No. 9.37's interpretation of section 273a is error where the conduct involved in the case fairly can be prosecuted as both direct and indirect child abuse.

15

crossed-off text, the trial court had written, "IN," in the left margin, indicating that it had erred by crossing out that portion of the instruction. In addition, the prosecutor commented in final argument, the abuse must take place "under circumstances likely to produce great bodily harm or death."

Appellant informs us when there is a discrepancy between the oral and written instructions, we must presume the jury was guided by the written instructions. (*People v. Sparks* (2002) 28 Cal.4th 71, 75, fn. 3.) However, we find the principle does not apply here. There were no significant discrepancies between the trial court's written and oral instructions. We view the jury instructions as a whole and in the light of the trial court's oral instructions and the prosecutor's final argument. In the circumstances, the jury would have been well aware the abuse must take place "under circumstances likely to produce great bodily harm or death." There was no error or constitutional violation.

(b) *Providing a further explanation as to the term "great bodily harm."*

The trial court charged the jury, "Great bodily harm refers to significant or substantial injury and does not refer to trivial or insignificant injury." On appeal, appellant complains the trial court failed to add to its charge the further phrase "great bodily harm does not include moderate injury." The claim is forfeited as no request was made at trial for such an instruction.

Nevertheless, we address appellant's claim on the merits to forestall appellant's claim of ineffective trial counsel, notwithstanding his substantial rights are not affected thereby. (See *People v. Lucas* (2014) 60 Cal.4th 153, 300 [finding appellant's failure to be present at the readback of testimony did not affect the defendant's substantial rights].)

On the merits, a trial court properly could have declined to modify the existing definition of "bodily harm" by the reference to "moderate injury." The charge given, "Great bodily harm" requires more than an insignificant or trivial injury and is a correct and complete statement of law requiring no further definition. (*People v. Wolcott* (1983) 34 Cal.3d 92, 108-109; § 12022.7, subd. (f) ["As used in this section, 'great bodily injury' means a significant or substantial physical injury"]; see *People v. Clark* (2011)

16

201 Cal.App.4th 235, 243-245 (*Clark*) [addressing a similar issue in the context of substantial evidence]; see also *People v. Escobar* (1992) 3 Cal.4th 740, 750, overruling *People v. Caudillo* (1978) 21 Cal.3d 562; *People v. Le* (2006) 137 Cal.App.4th 54, 58-60.)

Also, adding language to the instruction indicating no moderate injury is included within "great bodily harm" might have confused the jury. The additional amplification might cause an undue focus on whether an injury actually occurred and its specific nature. "Section 273a does not focus upon actual injury produced by abusive actions but 'rather upon whether or not the attendant circumstances make great bodily injury likely. Occurrence of great bodily injury is not an element of the offense.' [Citation.] It is the likelihood of foreseeable injury, rather than whether such injury in fact occurs, that is relevant. [Citation.]" (*People v. Lee* (1991) 234 Cal.App.3d 1214, 1220.)

Moreover, this point was not at issue. No reasonable juror would have believed appellant's conduct risked only moderate injury when appellant had stabbed S. when S. was only four feet from the daughters.

(c) *The failure to further define "criminal negligence."*

Appellant contends the trial court's instruction failed to further define for the jury the term "criminal negligence," which is required with charges of indirect child abuse, i.e., child endangerment. The Attorney General concedes error as the court in *Valdez, supra*, 27 Cal.4th at page 783, settled the issue. Defining "criminal negligence" is required so the jury knows the standard by which it must judge the breach of the duty of care to the child. (See also *People v. Peabody* (1975) 46 Cal.App.3d 43, 48-49 [where endangerment is at issue the jury must be informed "the defendants' conduct must amount to a reckless, gross or culpable departure from the ordinary standard of due care; it must be such a departure from what would be the conduct of an ordinarily prudent person under the same circumstances as to be incompatible with a proper regard for human life."].)

17

"In general the trial court has a sua sponte duty to give amplifying or clarifying instructions ' "where the terms used [in an instruction] have a technical meaning peculiar to the law." ' " (*People v. Richie* (1994) 28 Cal.App.4th 1347, 1360.)

"When . . . the federal constitutional error involves the trial court's failure to instruct on a necessary element, reversal is required under the *Chapman* test when 'the defendant contested the omitted element and raised evidence sufficient to support a contrary finding' (*Neder v. United States* (1999) 527 U.S. 1, 19); but the error is not prejudicial when it is clear 'beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence' (*id*. at p. 17)." (*People v. Huggins* (2006) 38 Cal.4th 175, 259; see also *People v. Gonzalez* (2012) 54 Cal.4th 643, 666 (*Gonzalez*).)

This court concludes it was error in this instance to fail to define the term, "criminal negligence." The courts in *Valdez* and *Peabody* found error in the failure to define this term without discussing whether the error is *Watson* or *Chapman* error. (*People v. Watson* (1956) 46 Cal.2d 818 (*Watson*); *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

But regardless of whether the failure to define this term is mere state error or federal constitutional error, the result is the same -- the error is harmless. The verdicts and findings for count 1 indicate the jury concluded appellant attacked his wife viciously with a knife. It also concluded in count 2 appellant personally inflicted injury by the use of a knife. The witnesses agreed on one scenario: during the melee, appellant approached his wife, stabbing at her. Despite some contrary testimony, the jury resolved the issue of the use of the knife against appellant in both charged offenses. The children, who were four feet away, predictably jumped in to assist their mother. There could be no dispute at trial appellant's conduct was reckless. No reasonable parent would plan or make a knife attack on his or her spouse within an arm's reach of his children. The teenagers were reasonably likely to be physically injured by their proximity to, or in an attempt to stop, the fray. The evidence of criminal negligence was overwhelming, and appellant introduced no contrary evidence on the issue of whether his conduct constituted

18

criminal negligence at trial.  (*Gonzalez, supra*, 54 Cal.4th at p. 666.)  The trial court charged the jury criminal negligence was an element of indirect child abuse.  The prosecution referred to that element in its final comments to the jury and referred specifically to the undisputed conduct described by the witnesses as constituting criminal negligence.  Given this one scenario, the jury necessarily determined appellant acted recklessly, i.e., with criminal negligence.

In the alternative, appellant argues his trial counsel was constitutionally ineffective.  But it is apparent here appellant suffered no prejudice from trial counsel's failure to bring to the trial court's attention the need to define the term "criminal negligence."  Making a proper request to define the term "criminal negligence" would not have assisted appellant.  The undisputed evidence overwhelmingly established that element of the offense.

c.  *Cumulative instructional error.*

Appellant also argues that the cumulative errors in the trial court's jury instructions require a per se reversal.  (E.g., *Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278.)  In *People v. Mil* (2012) 53 Cal.4th 400, 409-417, our Supreme Court set out the test for determining whether structural error, or harmless error, has occurred:  "The critical inquiry, in our view, is not the *number* of omitted elements but the *nature* of the issues removed from the jury's consideration.  Where the effect of the omission can be 'quantitatively assessed' in the context of the entire record (and does not otherwise qualify as structural error), the failure to instruct on one or more elements is mere ' "trial error" ' and thus amenable to harmless error review."

Appellant raises only one possible technical error with respect to surplusage and one instructional error, the latter of which this court finds on the facts presented is harmless beyond a reasonable doubt.  There is no structural error.  (*People v. Mil*, *supra*, 53 Cal.4th at p. 416.)  Even if viewed cumulatively, the errors are merely harmless beyond a reasonable doubt.

19

2. *The trial court should have instructed the jury as to a lesser included offense*.

Appellant contends the trial court had a sua sponte duty to instruct the jury on a lesser included offense of misdemeanor child abuse, the offense stated in section 273a, subdivision (b). He cites the decision in *Beck v. Alabama* (1980) 447 U.S. 625, 637, claiming the court must evaluate the error under *Chapman*, in lieu of the decision in *Watson*.

The elements of felony child abuse under subdivision (a) of section 273a and the misdemeanor provision, subdivision (b) of that section, are identical, with one exception. To prove felony child abuse, the prosecution must demonstrate the abuse occurred under "circumstances or conditions likely to produce great bodily harm or death." (§ 273, subd. (a); *People v. Burton* (2006) 143 Cal.App.4th 447, 454, fn. 4.)

A trial court's obligation to give a sua sponte instruction has been held to include giving instructions on lesser included offenses only where the evidence raises a question as to whether all of the elements of the charged offense are present. However, the court has no obligation to charge as to a lesser included offense where there is no evidence the offense is less than that charged. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

Here, there is no substantial evidence supporting an instruction on the lesser included misdemeanor offense of child abuse. The circumstances under which appellant sliced C. on the knee in the melee posed a substantial danger of producing great bodily harm or death. No rational jury would find otherwise. Consequently, there is no error.

Nor is there federal error. As is pointed out in *Breverman, supra,* 19 Cal.4th 142, at pages 166 to 169, the United States Supreme Court's decisions leave substantial doubt the federal Constitution confers any right to lesser included offense instructions in noncapital cases. They provide no basis for a conclusion the federal charter would require such instructions. The right to sua sponte instructions on all lesser necessarily included offenses supported by the evidence derives exclusively from California law. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1144 & fn. 10.)

20

3. *Sufficient evidence supports the jury's verdict of guilty of attempted voluntary manslaughter*.

Appellant contends the evidence is insufficient to support the guilty verdict in count 1, attempted voluntary manslaughter.

Appellant makes the following argument. At trial, the prosecutor commented during final argument appellant had the requisite specific intent required for a conviction of attempted voluntary manslaughter as he brought a knife to the meeting and became angry. Rather than punching S. in the stomach, appellant stabbed S. in a manner calculated to cause death. On appeal, appellant argues the evidence supporting the prosecutor's theory was insufficient to show beyond a reasonable doubt appellant acted with the specific intent to kill.

a. *The standard of review*.

In *People v. Whisenhunt* (2008) 44 Cal.4th 174, the California Supreme Court summarized the well-established standard of review. " 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence . . . . [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citation.]' [Citation.]" (*Id*. at p. 200.)

" ' "Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the

21

statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]". . . .' [Citation.]" (*People v. Barnes* (1986) 42 Cal.3d 284, 303-304, 306.)

The uncorroborated testimony of a single witness is sufficient to sustain a conviction unless it is physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Indeed, " '[t]he testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence, inconsistent or false as to other portions. [Citations.]' " (*In re Robert V.* (1982) 132 Cal.App.3d 815, 821.)

b. *Other relevant legal authorities.*

Voluntary manslaughter is the unlawful killing of a human being "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) "Voluntary manslaughter is a lesser included offense of murder when the requisite mental element of malice is negated by a sudden quarrel or heat of passion, or by an unreasonable but good faith belief in the necessity of self-defense." (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708.)

The completed crime of voluntary manslaughter may be committed with either an intent to kill or implied malice, i.e., a conscious disregard for life. (*People v. Lasko* (2000) 23 Cal.4th 101, 104; *People v. Blakeley* (2000) 23 Cal.4th 82, 91.) However, attempted voluntary manslaughter requires proof of an intent to kill, not of only a conscious disregard for life. (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1546-1547.)

c. *The analysis.*

Appellant argues the evidence is insufficient to support appellant's conviction of attempted voluntary manslaughter as "there was no competent reliable evidence supporting the prosecutor's theory" appellant brought the folding knife with him to Sorn's apartment. It is irrelevant to the validity of the verdict whether the evidence is

22

sufficient to support the prosecution's theory of the case. When an appellant raises an issue of insufficient evidence, the question this court addresses is not whether the evidence is consistent with the prosecutor's and trial counsel's closing arguments or theories of the case. We address whether the trial evidence is of solid and credible value in supporting a rational conclusion by the jury that appellant committed the charged offenses.

Here, the jury rejected the prosecution's claim of attempted deliberate and premeditated murder and found appellant guilty of the lesser included offense of attempted voluntary manslaughter. The trial court orally and in its written instructions informed the jury the specific intent to kill was necessary for a finding of guilt of attempted voluntary manslaughter.[7]

---

[7] In its oral instructions, the trial court charged the jury as to the elements of attempted murder, explaining both malice aforethought and the specific intent to kill were necessary elements. It told the jury the lesser included offense, attempted voluntary manslaughter, had the following elements. "Voluntary manslaughter is the attempted killing of a human being without malice aforethought. There is no malice aforethought if the killing or attempted killing occurred upon a sudden quarrel or heat of passion or in the act -- Let me start that again. [¶] There is no malice aforethought if the killing or attempted killing occurred upon the sudden quarrel or heat of passion. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A direct but ineffectual act was done by one person toward killing another human; 2. *That person had the specific intent to kill*; [¶] 3. The actions taken to kill were unlawful. [¶] Notice there is no malice aforethought. [¶] In deciding whether a direct but ineffectual act was committed -- and that's the definition of the attempt that I have already read to you. I am not going to read that portion again. [¶] To reduce an unlawful killing from murder to manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of the character and degree as naturally would excite and arouse the passion, and the assailant must act under the influence of that sudden quarrel or heat of passion."

The written instructions given to the jury charged it with CALJIC No. 8.41, as follows: "Every person who unlawfully attempts without malice aforethought to kill another human being is guilty of the crime of attempted voluntary manslaughter in violation of sections 664 and 192, subdivision (a) of the Penal Code, a crime. [¶] Voluntary manslaughter is the unlawful killing of a human being without malice aforethought. [¶] There is no malice aforethought if the killing or attempted killing occurred upon a sudden quarrel or heat of passion. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A direct but ineffectual act was done

23

Appellant's conduct circumstantially supports the jury's finding of the specific intent to kill. Appellant apparently had anticipated his wife would not be compliant with his wishes, and in that event, he planned to fatally stab her in order to keep his children with him in California. The evidence supported a jury conclusion appellant brought at least one knife with him to the meeting with his former wife. Furthermore, the manner of his attack demonstrated the specific intent to kill. Appellant suddenly rushed at S., stabbing her several times, and at least once deep in the abdomen. The intentional blow with the knife into her abdomen supports a strong inference he intended to kill S. by fatally damaging her internal organs.

It is settled such conduct demonstrates sufficient evidence of an intent to kill. (See *People v. Smith* (2005) 37 Cal.4th 733, 741-742, citing *People v. Arias* (1996) 13 Cal.4th 92, 162, [an intent to kill can be inferred from a defendant's purposeful use of a lethal weapon with lethal force, even if the act was done without advance consideration and only to eliminate a momentary obstacle or annoyance]; *People v. Bolden* (2002) 29 Cal.4th 515, 561 [there was no doubt the perpetrator had the intent to kill where the victim died from a single stab wound to the back that penetrated the victim's lungs and spleen and was five inches long and five to six inches deep and there was no evidence of

---

by one person towards killing another human being; and [¶] 2. *That person had the specific intent to kill the other person*; and [¶] 3. The actions taken to kill were unlawful. [¶] In deciding whether a direct but ineffectual act was committed, it is necessary to distinguish between mere preparation, on the one hand, and the actual commencement of the doing of the criminal deed, on the other. Mere preparation, which may consist of planning the killing or of devising, obtaining or arranging the means for its commission, is not sufficient to constitute an attempt. However, acts of a person who intends to kill another person will constitute an attempt . . . where those acts *clearly indicate a certain, unambiguous intent to kill*. The acts must be an immediate step in the present execution of the killing, the progress of which would be completed unless interrupted by some circumstances not intended in the original design." (Italics added.)

The trial court also charged the jury with CALJIC Nos. 8.42, 8.43 and 8.44, concerning Sudden Quarrel or Heat of Passion and Provocation Explained, Murder or Manslaughter -- Cooling Period, and Specific Emotion Alone Constitutes Heat of Passion.

24

a struggle].)  The evidence adduced at trial amply supports appellant's conviction of attempted voluntary manslaughter.

4. *Sufficient evidence supports the jury's verdict of guilty of felony child abuse.*

Appellant contends the trial evidence is insufficient to support the jury's verdict he was guilty of felony child abuse.

a. *The relevant legal authority.*

The standard of review is the same as that set out in contention 3 of this opinion, *ante*.

We have previously set out the elements of the offense of child abuse in its statutory terms and also quoted extensively from *Valdez, supra*, 27 Cal.4th 778, which fully explains the elements of the offense.

b. *The analysis.*

Appellant contends the evidence is insufficient to support his conviction of felony child abuse.  He argues there is an absence of evidence establishing beyond a reasonable doubt appellant acted either willfully or was criminally negligent or that his conduct was committed under circumstances likely to produce great bodily harm.

At the outset, we must clarify six points.

One, this court does not evaluate the sufficiency of the evidence based on the theory the prosecutor articulates during his or her final comments to the jury.  The question this court addresses is whether the trial evidence supports a rational conclusion appellant committed the offense within the limitations of the charges in the information and delineated by the trial court's jury instructions.

Two, in this case, the trial court charged the jury on theories of direct and indirect child abuse with the following:  "In order to prove this crime, each of the following elements must be proved:  [¶]  1.  A person who had care or custody of a child [¶] willfully caused or, willfully and as a result of criminal negligence, permitted the child to be injured; or [¶] willfully caused or, willfully and as a result of criminal negligence, permitted the child to be placed in a situation where his or her person or health may be

25

endangered; and [¶] 2. The person's conduct occurred under circumstances likely to produce great bodily harm or death."

Three, regardless of the trial court's or the prosecutor's intent in drafting such instructions, the instructions encompass theories of direct and indirect felony child abuse. Therefore, for purposes of assessing the sufficiency of the evidence, we shall evaluate the trial evidence against the language of section 273a, subdivision (a), keeping in mind child endangerment requires criminal negligence.

Four, the word "willfully" as used in the child endangerment provisions of section 273 " 'when applied with the intent to which an act is done or omitted, implies simply a purpose or willingness to commit the act or make the omission referred to. It does not require an intent to violate [the] law, or to injure another, or to acquire any advantage.' " (*Valdez, supra*, 27 Cal.4th at pp. 787-788.) Criminal negligence is not accidental conduct, nor does it constitute ordinary negligence. It is a gross departure from the conduct of an ordinarily prudent person. (*Id.* at p. 790.)

Five, the act here of willfully causing a child to be injured has elements similar to battery of an unintended victim. (See *Valdez, supra*, 27 Cal.4th at p. 787; *People v. Trujillo* (2010) 181 Cal.App.4th 1344, 1354 ["a defendant who harbors the requisite mental state for assault while committing one or more acti rei such that a direct, natural, and probable result is a battery against two persons may be convicted of assault against each"]; see also *People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1189 [the test for whether the battery also occurred on the unintended victim of an assault "is whether an objectively reasonable person with knowledge of these acts would appreciate that . . . a battery would directly and probably result from his actions"].)

Six, we note the phrase "circumstances likely to produce great bodily harm or death" in section 273a means " 'the probability of serious injury is great.' " (*Sargent, supra*, 19 Cal.4th at p. 1223; *People v. Chaffin* (2009) 173 Cal.App.4th 1348, 1351-1353; contra, *People v. Wilson* (2006) 138 Cal.App.4th 1197, 1204 [holding that "likely" as used in section 273a means there likely is a substantial danger, i.e., a serious and well-founded risk, of great bodily harm or death].)

26

Here, while the adults were talking, C. and Ch. were not paying attention, but talking among themselves and playing on their mobile phones. They were four feet from S. when appellant suddenly jumped up, rushed at S. and hugged S. to him, swinging the knife wildly in order to stab at S. with sufficient force to cause a fatal wound. S. and appellant fell to the ground and wrestled.

Predictably, when Sorn and the teenagers realized appellant was attacking S., they jumped up and attempted to hold appellant back and pull him away so S. could escape from the apartment. In the melee, appellant sliced C. in the knee, as well as landed the potentially fatal stab wound to S.'s abdomen and stabbed S. several times on the arms and hands.

The above evidence is sufficient to support appellant's conviction of indirect child abuse in circumstances likely to produce great bodily harm or death. Appellant endangered his two daughters when he attacked his former wife in close proximity to them. The daughters were in range of the attack as their mother was sitting within four feet. It was reasonably foreseeable the teenagers and Sorn would come to S.'s aid upon the attack. The attack demonstrates criminal negligence. A reasonable person would not have engaged in such conduct in such close proximity to his own teenagers. And, a reasonable person would have realized the attack in such close quarters was likely to result in serious bodily harm or death to the teenagers.

Apparently, appellant did not seriously injure C. However, the circumstances of his flailing around with the knife while his daughters grabbed him bodily to prevent the stabbing made it likely he might cause a more serious injury to the other participants in the melee. In this melee, one of the girls could have lost an eye, been disfigured or had a body part severed resulting in a serious handicap. Even the apparently shallow cut suffered by C. on a knee might easily have severed critical tendons, leaving her crippled.

Appellant argues there is no evidence of direct child abuse. However, here, appellant was well aware of his children's presence four feet from S. and that probably, Sorn and the teenagers would intervene once they realized appellant was attempting to injure S. In the circumstances, appellant's course of conduct amounted to willfully

27

causing injury to C. A reasonable person would have been aware a battery of the others in the room might directly and probably result from wildly flailing away at his wife with the knife.

We also reject appellant's claim Officer Torres's testimony is insubstantial in supporting the verdict insofar as the officer claimed at the hospital Ch. told him she saw appellant swing the knife and cut C. C. testified she felt numbness in her knee during the melee, and immediately afterwards, she looked down and discovered she was bleeding. This evidence is sufficient circumstantial evidence to support appellant's conviction of felony child abuse without reference to Ch.'s out-of-court statement to Officer Torres.

Nevertheless, Evidence Code section 1235 permits the use of prior inconsistent statements at trial as substantive evidence of guilt. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1144, overruled in part on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151; *People v. Hawthorne* (1992) 4 Cal.4th 43, 55, fn. 4.) At trial, it was apparent the witnesses, appellant's friend and family, attempted to ameliorate appellant's punishment by denying appellant brought a knife to the meeting or that they had observed him with a knife during the melee. Based on the officer's testimony, it was reasonable for the jury to conclude Ch. told the truth to the officer at the hospital, but at trial, Ch. hedged concerning her observations of the knife in order to reduce appellant's punishment. This court does not reweigh evidence or reevaluate witness credibility. (*People v. Alexander* (2010) 49 Cal.4th 846, 917.) It was up to the jury to determine whether the officer's testimony was credible in supporting a conclusion C. was injured by appellant's flailing knife.

To support his claim of insufficient evidence, appellant cites several cases involving severe neglect. Then he argues, by contrast, the facts in this case are not severe enough to demonstrate criminal negligence. However, the trial evidence here was sufficient for a rational jury to conclude appellant acted recklessly and in a gross departure from the way an ordinarily careful person would act in the same situation. The infliction of injury did not amount to mere negligence or accident.

5. *The* Pitchess *motion.*

28

Appellant has requested an independent review of the in camera *Pitchess* proceedings conducted by the trial court. (*Pitchess, supra*, 11 Cal.3d 531.)

a. *Background*.

On June 11, 2013, appellant filed a *Pitchess* motion. He requested the names and addresses and contact information for all witnesses to any prior complaints filed against Officer Gutierrez for acts involving moral turpitude. He requested any records of statements or testimony given in relation to such complaints given by any witnesses. Specifically, the supporting affidavit claimed appellant was charged with attempted deliberate and premeditated murder and felony child abuse. On the date of the alleged offense, Officer Gutierrez had spoken to appellant after a *Miranda* waiver. (*Miranda v. Arizona* (1966) 384 U.S. 436.) The officer indicated in his report appellant told him he was angry because his former wife wished to take the children with her to Kentucky. He wanted the children to remain in Long Beach where he lives. Appellant admitted he had stabbed his wife. Trial counsel claimed in the motion's supporting affidavit that the defense might well deny appellant made those statements at the trial.

On June 24, 2012, the trial court held a *Pitchess* hearing. At the hearing, trial counsel argued even if appellant admitted making a statement to Officer Gutierrez, he may well claim at trial the officer's description in the arrest report concerning appellant's statement was incorrect and inaccurate. The trial court granted appellant's motion for disclosure. It later held an in camera review of any complaints Officer Gutierrez had that were related to moral turpitude. The trial court ruled the scope of the hearing would be limited to whether there were any allegations of filing a false police report against Officer Gutierrez.

After an in camera review, the court ordered disclosure of certain discoverable information.

29

b. *The relevant authority*.

The California Supreme Court in its decision in *People v. Mooc* (2001) 26 Cal.4th 1216, 1228, authorized appellate courts to review in camera *Pitchess* proceedings for error. During an in camera hearing pursuant to *Pitchess,* the "trial court should then make a record of what documents it examined before ruling on the *Pitchess* motion. Such a record will permit future appellate review. If the documents produced by the custodian are not voluminous, the court can photocopy them and place them in a confidential file. Alternatively, the court can prepare a list of the documents it considered, or simply state for the record what documents it examined." (*Mooc*, at p. 1229.) The standard for review is an abuse of discretion. (*Id*. at p. 1228; *People v. Samayoa* (1997) 15 Cal.4th 795, 827 [trial courts have wide discretion when ruling on motions to discover police officers' personnel records].)

We have independently reviewed the sealed reporter's transcripts of the in camera hearings, and the trial court's decision regarding the discoverability of material it found in the officer's personnel files. The transcripts constitute an adequate record of the documents provided to, and reviewed by, the trial court in the hearings. Based on our review of the court's findings, we conclude the court fulfilled its responsibilities and properly exercised its discretion with regard to any discovery it denied. (*People v. Mooc, supra*, 26 Cal.4th at pp. 1228-1229.) The trial court conducted a diligent and thorough review of pertinent documents in the deputies' personnel files before concluding that only certain evidence was properly discoverable. There was no error.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.

We concur:


KITCHING, J.


EDMON, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.